UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| LINDA J. ROSSBACH, Individually and on Behalf of All Others Similarly Situated, <br>                    Plaintiff, <br>     v. <br><br> VASCO DATA SECURITY INTERNATIONAL, INC., T. KENDALL HUNT, CLIFFORD K. BOWN, and JAN VALCKE, <br><br>                    Defendants. | Case No. 1:15-cv-06605 <br><br> **CLASS ACTION** <br><br> **AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Hon. Andrea R. Wood |

## AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff John F. Bunk ("Plaintiff"), by and through its counsel, individually and on behalf of all others similarly situated, for its Amended Complaint for Violation of the Federal Securities Laws (the "Complaint") against Defendants, allege the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through its attorneys, which included, among other things, conversations with potential witnesses, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding VASCO Data Security International, Inc., ("VASCO" or the "Company"), analysts' reports and advisories about VASCO and information readily obtainable on the Internet.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal se securities class action on behalf of all persons who purchased or otherwise acquired VASCO common stock between April 28, 2015, and July 28, 2015, inclusive (the "Class Period"), against VASCO and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). As set forth in detail below, Defendants violated Sections 10(b), and 20(a), of the 1934 Act by engaging in a manipulative scheme intended to benefit themselves at the expense of ordinary investors who purchased VASCO stock during the Class Period.

2.      VASCO is an IT security company that designs, develops and markets security solutions that secure and manage access to digital assets and protect transactions. VASCO issues fiscal year revenue guidance and regularly comments on and monitors its pipeline. Prior to the start of the Class Period, in 2014, VASCO sold a number of card readers to Rabobank which began shipping in the third quarter of 2014 and was scheduled to be completed by the third quarter of 2015.

3.      During the Class Period, Defendants made numerous positive statements about its non-Rabobank revenue and its upcoming pipeline. For example, on April 28, 2015, Defendants commented on the pipeline and non-Rabobank revenue stating, "[w]e're also seeing additional growth in our sales pipeline," and that they "believe that our sales pipeline at one of the strongest point in our company's history." Defendants added that the increase in revenue from the banking market reflected "a significant increases in revenues from other customers in the quarter."

4.      Just days after these statements, between May 1, 2015 and May 8, 2015, Defendants Valcke and Bown made large atypical stock sales of $3,113,500 and $5,695,259, respectfully.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

5.      During an earnings call after the market closed on July 28, 2015, Defendants shocked investors when they revealed that revenues from non-Rabobank customers *decreased* for the second quarter when compared to 2014, and that "revenues from customers, excluding Rabobank [was] expected to be flat for full year 2015 compared to full year 2014."

6.      In response to this negative news revealed on the July 28, 2015 earnings call, the price of VASCO stock declined substantially. After closing at $26.55 on July 28, 2015, the stock opened at $22.89 per share on July 29, 2015, falling to a low of $20.26 and ultimately closing at $20.45, a decline of more than 22.9%, on abnormally high trading volume of more than 6.86 million shares. The stock continued trading at an unusually high volume over the next four (4) trading days, dropping to a price of $18.51 per share on August 3, 2015, a decline of more than 30%.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

10. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of NASDAQ.

11. This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

## PARTIES

12. Plaintiff purchased VASCO shares as set forth herein and in its certification filed with the Court in connection with its motion for lead plaintiff (Dkt. No. 25-1). Plaintiff's certification is incorporated herein by reference.

13. Defendant VASCO is a Delaware corporation with its principal executive offices located at 1901 South Meyers Road Suite 210 Oakbrook Terrace, IL 60181. VASCO's common stock trades on the NASDAQ under the ticker symbol "VDSI."

14. Defendant T. Kendall Hunt ("Hunt") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Chairman.

15. Defendant Clifford K. Bown ("Bown") has served at all relevant times until October 1, 2013 as the Company's Chief Financial Officer ("CFO").

16. Defendant Jan Valcke ("Valcke") has served at all relevant times until November 15, 2016 as the Company's President and Chief Operating Officer ("COO").

17. The defendants referenced above in ¶¶ 14, 15 and 16 are sometimes referred to herein as the "Individual Defendants."

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

18.     VASCO and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.     Background

#### *Company Background and Products*

19.     VASCO is an IT security company that designs, develops and markets security solutions that secure and manage access to digital assets and protect transactions. VASCO provides two-factor authentication and digital signature solutions to financial institutions. VASCO solutions secure access to data and applications on-premise in global enterprises and in the cloud, and provide tools for application developers to integrate security functions into their web-based and mobile applications. Two-factor authentication (also known as 2FA) strengthens the process of verifying the identity of users by means of a combination of two different components. These components may consist of something that the user knows, such as username, and another item that the user possesses, such as a VASCO hardware or software authenticator that generates a one-time password. Two-factor authentication is a type of multi-factor authentication. VASCO's security solutions include both open standards-based and proprietary solutions, some of which are patented products and services used for authentication, digitally signing transactions and documents, and identity management in Business-to-Business, Business-to-Employee and Business-to-Consumer environments.

20.     In 1996, VASCO acquired Lintel Security NV/SA, a Belgian corporation, which included assets associated with the development of security tokens and security technologies for personal computers and computer networks. Also in 1996, VASCO acquired Digipass NV/SA, a

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

Belgian corporation, which was also a developer of security tokens and security technologies and whose name was changed to VASCO Data Security NV/SA in 1997.

21.     In 1997, VASCO Data Security International, Inc. was incorporated and in 1998, VASCO completed a registered exchange offer with the holders of the outstanding securities of VASCO Corp. In December 2006, VASCO opened its international headquarters in Zurich, Switzerland. In 2007, VASCO established wholly-owned sales subsidiaries in Brazil and Japan. In 2008 and 2009, VASCO established wholly-owned sales subsidiaries in Mumbai, India and Bahrain, respectively. In 2011, VASCO completed the establishment of a wholly-owned sales subsidiary in China and received a trade license for a new subsidiary in Dubai, United Arab Emirates.

22.     In May, 2013, VASCO acquired Cronto Limited ("Cronto"), a provider of secure visual transaction authentication solutions for online banking. Cronto's patented solution attempts to assure that a financial transaction has not been compromised, or "hacked." VASCO integrated the Cronto solution into the Company's security platforms VACMAN Controller and IDENTIKEY Server.

23.     In May 2014, VASCO acquired Risk IDS, a provider of risk-based authentication solutions to the global banking community. The platform is designed to evaluate the profile of the user requesting access to the system to determine the risk profile associated with the transaction.

24.     VASCO's primary product and service lines include three categories of solutions; Host System products, which is typically a component of an organization's IT infrastructure, Client Authenticators, which are devices used by end users for authentication, and Developer Tools, which are used by application developers to increase the security of their mobile applications.

25.     VASCO designs, develops, markets and supports both propriety and open standards-based hardware and software security systems that manage and secure access to information assets. VASCO products enable secure financial transactions to be made over private enterprise networks and public networks, such as the Internet. The multi-factor user authentication is delivered via the Company's hardware and software DIGIPASS security products (collectively "DIGIPASSES"), many of which incorporate an electronic and digital signature capability, which further protects the integrity of electronic transactions and data transmissions.

26.     Many of the software DIGIPASSES are focused on the mobile platform and can be downloaded directly to mobile devices, such as DIGIPASS for Mobile, while others are integrated directly into mobile applications (using DIGIPASS for Apps) that are downloaded onto mobile devices.

27.     Most of the products are purchased by businesses and, depending on the business application, are distributed to either their employees or their customers. Those customers may be other businesses or, as an example in the case of Internet and mobile banking, customer banks' corporate and retail customers. VASCO sells products either through: (a) a product sales and licensing model or (b) through a services platform, which includes cloud-based service offering.

### *VASCO's Customers, Guidance, and Pipeline*

28.     Historically, VASCO has focused on two target markets, the banking and/or financial services market (the "Banking Market" or "Banking") and the enterprise and application security market (the "Enterprise and Application Security Market" or "Enterprise and Application Security"). Target markets include all applications where individuals use a username and password to access assets, information, and transactions that have value. The Banking Market has traditionally comprised of over 80% of all revenues received.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

29.     VASCO's customers include HSBC, Rabobank, Belfius, Sumitomo Mitsui Banking Corporation, BNP-Paribas Fortis, Swedbank, The Bank of Tokyo-Mitsubishi, Citibank, and Commonwealth Bank of Australia. In 2014, Rabobank ordered a number of card readers that incorporated the Company's CrontoSign technology which began shipping in the third quarter of 2014 and was scheduled to be completed by the third quarter of 2015.

30.     VASCO's top 10 customers contributed 50%, 46%, and 40%, in 2015, 2014, and 2013, respectively, of total worldwide revenue. In 2015 and 2014, Rabobank contributed 30% and 12% of worldwide revenue, respectively. During all relevant times, the majority of VASCO's revenue was generated in Europe, Middle East and Africa ("EMEA").

31.     VASCO recognizes revenue in accordance with ASC 985-605 and records revenue when there is persuasive evidence that an arrangement exists, delivery has occurred, the fee is fixed or determinable and collection of the revenue is probable.  The Company also maintains a backlog and tracks its pipeline. The Company's backlog at December 31, 2015 was approximately $51 million compared to $113 million at December 31, 2014 and $42 million at December 31, 2013. The Company also gives fiscal year revenue and operating margin guidance, and updates these numbers quarterly.

32.     The Company tracks its pipeline by first looking at big deals it has in the works, and the percentage of confidence of the deals, then looking at the middle range deals, and then looking at opportunities and activities in general.  The Company's main method to generate pipeline is to work with existing customers.  The Company hopes that the existing customers will issue a request for information, the Company would then respond and hopefully they can begin a proof-of-concept. In the proof-of-concept, the products are actually used by a group of users, who determine whether they like the product.  After the proof-of-concept phase, the Company will

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

make a proposal and hope that the old customer renews its hardware. VASCO's whole idea is to go back to its existing customers every four to six years and upsell or refresh them by replacing what they have with something new, yet still as strong or stronger as the previous product. Most of VASCO's business, around 80% a year, comes from existing customers.

33.      Throughout the Class Period, the Individual Directors monitored the pipeline making numerous statements to investors. Specifically, Hunt's statements during the Class Period included, "Due to the strong performance and strong pipeline of potential new orders our expectations for the year have increased and this is reflected in our increased guidance which we will discuss in more detail later in the call." Hunt also stated, "This is based on our strong first quarter and having greater visibility into our pipeline of potential new orders for both our traditional and new products." Hunt further stated, "We're finding a very strong reception and interest in the Cronto sign products as well as DIGIPASS for apps." Finally Hunt added, "We're also seeing additional growth in our sales pipeline. While not every opportunity can be converted into a revenue we believe that our sales pipeline at one of the strongest point in our company's history. Our backlog remained strong, we're pleased with a number of proof of concept and product evaluations that are being conducted with our Cronto based and DIGIPASS mobile application security solutions."

34.      Valcke also made comments relating to the pipeline, including, "We're also seeing additional growth in our sales pipeline. While not every opportunity can be converted into a revenue we believe that our sales pipeline at one of the strongest point in our company's history. Our backlog remained strong, we're pleased with a number of proof of concept and product evaluations that are being conducted with our Cronto based and DIGIPASS mobile application security solutions." Valcke added, "And indeed like Ken is mentioning we see a nice and a strong

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

demand basically for us as well our DIGIPASS for apps products as well for over DIGIPASS based on the Cronto technology."

35.     In addition to Hunt's and Valcke's comments Bown stated, "The 10K that we filed indicated that the Rabobank order started in the third quarter of 2014 and was scheduled to be completed in the third quarter of 2015. However our history with Rabobank has been that we get follow on orders after the initial roll out. So while we don't have orders in hand and in backlog today that go beyond the third quarter of 2015 we would expect that there will be either orders in the fourth quarter or in 2016 that have similar products."

## B.     Defendants Materially Misrepresented the Strength of Their Business

### *April 28, 2015 – Press Release & Earnings Call*

36.     VASCO issued a press release disclosing its first quarter earnings results for fiscal year 2015 on April 28, 2015 (the "Q1 2015 Press Release"). VASCO filed a copy of the Q1 2015 Press Release as an exhibit to a Form 8-K filed with the SEC on May 4, 2015.

37.     The Q1 2015 Press Release stated in pertinent part:

**Guidance for full-year 2015:**

VASCO is increasing its guidance for revenue and operating income as a percentage of revenue for the full-year 2015 as follows:

- Revenue is expected to be in the range of $230 million to $240 million, compared to $220 million to $230 million communicated previously, and

- Operating income as a percentage of revenue, excluding the amortization of purchased intangible assets, is projected to be in the range of 19% to 22%, compared to 17% to 20% communicated previously.

"We are pleased with the results of the first quarter," stated T. Kendall Hunt, Chairman & CEO. "Revenue reported for the first quarter of 2015 was the highest of any quarter in our history and reflected both the delivery of a significant amount of card readers using our new Cronto technology to Rabobank, which was part of

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

our record backlog at the beginning of the year, and a significant increase in revenues from other customers in the quarter. Revenues related to our delivery of all products sold to Rabobank globally exceeded 30% of the first quarter's revenue while the combined revenues from all other customers in the first quarter of 2015 increased more than 15% over the first quarter of 2014. We are also increasing our guidance for the full-year 2015 revenue based on the strength of our first quarter results *and strong pipeline of potential new orders for both our traditional and new products.* We expect that our mobile solutions, DIGIPASS for Apps and DIGIPASS for Mobile, and solutions based on our Cronto technology will continue to make important contributions to our revenues in 2015 and beyond. As noted previously, and as evident from our current guidance, we expect that comparisons of 2015 results to the prior year will be stronger in the first half of this year than in the second half."

Q1 2015 Press Release, p. 2.

38.     On April 28, 2015, Defendants Hunt, Bown, and Valcke held an earnings conference call on behalf of the Company to discuss the earnings reports that the Company had released that day for the first quarter of fiscal 2015 (the "Q1 2015 Earnings Call").

39.     Hunt stated in pertinent part:

Due to *the strong performance and strong pipeline of potential new orders our expectations for the year have increased* and this is reflected in our increased guidance which we will discuss in more detail later in the call. We believe that this quarter reflects three of the key elements of our business strategy. The first key element is to provide products that have leading edge technology that not only increases the level of security for our customers but also increases the users' convenience. The second key element is to generate *a continuing sustainable repeatable revenue stream* from existing customers as a replace and/or upgrade the level of security of the products they use and third key element is to expand our market by adding new customers.

The sale of Cronto based Rabo Scanner card readers to Rabobank which has been a strong customer of VASCO for many years is a prime example of the first two elements, Rabobank was an early adopter of our state of the art Cronto technology which uses a high definition, colored QR code to improve security and to make reading of the QR code faster and more reliable for the end user.

Revenues related to our delivery of all products sold to Rabobank globally exceeded 30% of our first quarter revenue. As we have shared previously we have a project based model and while a roll out of this magnitude contributes to the lumpiness in our quarterly comparisons it expands our footprint in the market. It

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

also serves as an important benchmark as other existing customers and potential customers evaluate enhancing their defenses against the newest and most hacker attacks.

At the same time the combined revenues from all our other customers in the first quarter of 2015 which includes contribution from existing and new customers increased more than 15% over the first quarter of 2014 which is a prime example of the second and third elements that I mentioned before.

Revenues from customers added in 2014 and 2015 were also an important part of this increase in revenues. The recently released 2015 Data Breach Investigations report from Verizon confirms that for the second year in a row comprised user credentials meaning stolen user names and passwords were a contributing factor in 2/3rds of all successful breaches.

                            *        *        *

In summary we remain enthusiastic about building upon our 49 consecutive quarter of delivering positive results for our shareholders. We feel that the strength of our legacy solutions augment, innovative new offerings including our Cronto technology and our DIGIPASS for mobile application security solutions position VASCO for continued forward progress and executing our long term strategy.

                            *        *        *

Thank you, Cliff. At this time I would like to highlight our guidance for 2015. VASCO is increasing it's guidance for revenue for the full year of 2015. We currently believe that our revenue will be in the range of $230 million to $240 million compared to $220 million to $230 million communicated previously. This is based on our strong first quarter **_and having greater visibility into our pipeline of potential new orders for both our traditional and new products_**. We expect that our mobile solutions DIGIPASS for apps and DIGIPASS for mobile and solutions based on our Cronto technology will continue to make important contributions to our revenue in 2015 and beyond. As has been our recent practice we continue to provide annual guidance only given the fact that quarterly comparisons to any prior period are challenging given our sales and licensing model. Within that context as noted previously and as evident from our current guidance we expect the comparisons of 2015 results to the prior year will be stronger in the first half of this year than in the second half.

Q1 2015 Earnings Call.

40.     On the Q1 2015 Earnings Call, Valcke also stated in pertinent part:

- 12 -

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

*We're also seeing additional growth in our sales pipeline.* While not every opportunity can be converted into a revenue *we believe that our sales pipeline at one of the strongest point in our company's history*. *Our backlog remained strong*, we're pleased with a number of proof of concept and product evaluations that are being conducted with our Cronto based and DIGIPASS mobile application security solutions.

Q1 2015 Earnings Call.

41.  Q1 2015 Earnings Call, Bown also stated in pertinent part:

The increase in revenue from the banking market reflected both delivery of a significant amount of card readers using our new Cronto technology to Rabobank *and a significant increases in revenues from other customers in the quarter.* The increase in revenues from the enterprise and application security market primarily reflects growth and maintenance in support revenues. The comparison of revenues was also impacted by changes in currency rates during the period. U.S. dollar on average strengthened approximately 19% against the euro for the quarter ended March 31, 2015 when compared to the same period in 2014.

Q1 2015 Earnings Call.

42.  Additionally, during the Q1 2015 Earnings Call, in response to an Analyst's

questions regarding the Company's second half revenue and pipeline, Hunt, Bown, and Valcke

stated in pertinent part:

**Joe Maxa [Analyst]**

The Rabobank obviously very strong in the quarter, last quarter you suggested it would go into Q3, are we still expecting that this is the question as this Q2 look like it will be a similar contribution from Rabobank?

**Cliff Bown**

The 10K that we filed indicated that the Rabobank order started in the third quarter of 2014 and was scheduled to be completed in the third quarter of 2015. However *our history with Rabobank has been that we get follow on orders after the initial roll out*. So while we don't have orders in hand and in backlog today that go beyond the third quarter of 2015 *we would expect that there will be either orders in the fourth quarter or in 2016 that have similar products*. In terms of the amount of revenue that would come in Q2 versus Q1, or Q3 versus Q2, at this point we're about half way maybe a little over halfway through that initial order. So I guess the answer without getting quarter specific as we don't want to give quarter guidance

- 13 -

is between second and third quarter, we should see volume similar to what we have seen since the third quarter of 2014 through the end of the first quarter of 2015.

**Joe Maxa**

And then the overall pipeline, obviously it sounds like it's still very strong, I'm just wondering Ken or Jan on these Cronto sign, potential large deals that could occur and just what that pipeline looks like and do we expect those to be mostly in Europe or are you starting to see some opportunity outside of that perhaps in Asia Pacific or in the U.S.?

**Ken Hunt**

We're finding *a very strong reception and interest in the Cronto sign products as well as DIGIPASS for apps.* I would like Jan, to give you a little more color however.

**Jan Valcke**

On the DIGIPASS for apps you need to see that today the Cronto is completely integrated in that suite of products. So if we talk about DIGIPASS for apps, an option for customers is also to use that Cronto technology if it comes to client software. If it comes to the hardware devices we have of course the whole suite of products where Cronto is a part of it. And indeed like Ken is mentioning *we see a nice and a strong demand basically for us as well our DIGIPASS for apps products as well for over DIGIPASS based on the Cronto technology*. We see that in Europe but we that also in Asia and let's says in North America we see mainly the software based solutions as a demand.

**Ken Hunt**

And without giving you numbers one of the ways we -- number of proof of concepts that are underway where our customer has brought in our solution and is judging the reception of their customers by how they like the product so that's also a very strong indicator. The number of proof of concepts that we have underway right now.

**Joe Maxa**

So Ken, last for me then is on these proof of concepts how does that look compared to six months ago or a year ago on the new Cronto technology, is it double tripled? How should we think of that?

**Jan Valcke**

- 14 -

I should say about the proof of concepts in general let me, I don't want to give too much specifics about the proof of concept *is probably 50% higher than six months to a year ago.*

Q1 2015 Earnings Call.

43.     The above statements about the Company's revenue and pipeline were materially false and/or misleading because they misled investors about the strength of VASCO's business and revenue potential. Defendants told investors that the increase in revenues was from both Rabobank and non-Rabobank customers and emphasized that there was a "strong pipeline of potential new orders for both our traditional and new products," and "greater visibility into [VASCO's] pipeline of potential new orders for both our traditional and new products." These statements were misleading because Defendants knew that non-Rabobank revenue in the second half was going to decrease as compared to the previous year, but represented that the Company had other deals in the pipeline. Defendants therefore used Rabobank revenue and an imaginary pipeline to disguise the fact that non-Rabobank revenue was declining and/or remaining flat over the second half of 2015.  In reality, non-Rabobank revenue was actually going to *decrease* in the upcoming quarters and stay flat over the end of the year as compared to 2014.

44.     Defendants further misled investors about non-Rabobank revenue and the pipeline touting the Company's ability to create "a continuing sustainable repeatable revenue stream." Defendants added that they "believe that our sales pipeline [is] at one of the strongest point[s] in our company's history" and the increase in revenue was due to "a significant increase[] in revenues from other customers."  These statements were false because the Company's pipeline was weaker than it was the previous year as shown by the decrease in non-Rabobank revenue over the next quarters as compared to the previous year.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

45.     Defendants also stated that they will continue to get follow on orders from Rabobank and that they expect to continue getting orders into the fourth quarter of 2015 or in 2016. Defendants also stated that there was "a very strong reception and interest in the Cronto sign products as well as DIGIPASS for apps" and that they saw "a nice and a strong demand basically for us as well our DIGIPASS for apps products as well for over DIGIPASS based on the Cronto technology." Defendants tout that their number or proof of concepts is "probably 50% higher than six months to a year ago." These statements are misleading because they tell investors that the Company's non-Rabobank revenue will continue to grow due to the pipeline when in reality, the Company was using Rabobank revenue to disguise its decline in revenue for the second half of 2015.

46.     The above misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company.  In fact, on April 29, 2015, Dougherty & Company published an analyst report reiterating a "Buy Rating" on VASCO stock.  Dougherty based its "Buy Rating" on comments and facts stated by the Individual Defendants in the Press Release and Earnings Call about the Company's pipeline.  As stated by Dougherty, the Company "reported continued strength in its backlog and pipeline;" "[VASCO] is seeing increasing demand for its Crontosign and mobile technologies including DIGIPASS for Apps (DPA) and DIGIPASS for Mobile (DPM);" and "VDSI's 1Q revenue grew 68% y/y driven by ~$20 million from Rabobank and greater than 15% growth from customers excluding Rabobank."

47.     Dougherty based its rating decision and told investors to buy stock specifically because of VASCO's comments about its non-Rabobank revenue and the Company's pipeline. Thus, like analysts evaluating the Company, a reasonable investor would have viewed the false

and/or materially misleading identified above as significantly altering the total mix of information available about the Company.

### *May 5, 2015 – Quarterly Report*

48.      On May 5, 2015, VASCO filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 ("1Q 2015 Form 10-Q").  Defendants Hunt and Bown signed the 1Q 2015 Form 10-Q on behalf of the Company.

49.      The Company stated, in pertinent part, the following about revenue recognition:

Total revenue in the first quarter of 2015 increased $26,312 or 68% from first quarter of 2014. The increase in revenue in the first quarter of 2015 compared to the first quarter of 2014 reflected both the delivery of a significant amount of card readers using our new Cronto technology to Rabobank, which was part of our backlog at the beginning of the year, ***and a significant increase in revenues from other customers in the quarter***. Revenues related to our delivery of all products sold to Rabobank globally exceeded 30% of the first quarter's revenue in 2015 while the combined revenues from all other customers in the first quarter of 2015 increased more than 15% over to the first quarter of 2014. As noted in our annual report on Form 10-K for the year ended December 31, 2014, the order from Rabobank for card readers incorporating our Cronto technology began shipping in the third quarter of 2014 and is scheduled to be completed in the third quarter of 2015.

Revenue generated in EMEA for the first quarter of 2015 was $20,580 or 77% higher in the first quarter of 2015 than in the first quarter of 2014. The increase reflected an increase of approximately 95% in revenue from the Banking market and a 5% increase in revenue from the Enterprise and Application Security market. The growth of revenues in the Banking market was primarily attributable to sales of card readers that use our Cronto technology.

1Q 2015 Form 10-Q, p. 19.

50.      The above statements about the Company's revenue and pipeline were materially false and/or misleading because they misled investors about the strength of VASCO's business and revenue potential. Defendants told investors that the increase in revenues was from both

Rabobank and non-Rabobank customers. These statements were misleading because Defendants knew that non-Rabobank revenue in the second half was going to decrease as compared to the previous year, but represented that the Company's non-Rabobank revenue was on the increase and that they had other deals in the pipeline. Defendants therefore used Rabobank revenue and an imaginary pipeline to disguise the fact that non-Rabobank revenue was declining and/or remaining flat over the second half of 2015. In reality, non-Rabobank revenue was actually going to *decrease* in the upcoming quarters and stay flat over the end of the year as compared to 2014.

51. The above misstatements and omissions were material because a reasonable investor would have viewed them as significantly altering the total mix of information available about the Company. Since the Rabobank contract was going to end in 2015, investors were paying close attention to VASCO's pipeline and upcoming deals. Thus, the truth that non-Rabobank revenue would be decreasing as compared to the previous year, would have significantly altering the total mix of information available about the Company.

**C.     Insider Stock Sales**

52. Between May 1, 2015 and May 8, 2015, just days after the misrepresentations, Valcke and Bown made large atypical stock sales. Prior to these sales, neither Valcke nor Bown had sold any stock. Between May 1, 2015 and May 4, 2015, Valcke sold 120,000 shares of VASCO stock, 23.1% of his holdings, at a price between $25.50 and $26.20 per share. This resulted in proceeds to Valcke of $3,113,500, which was $2,671,500 more than Valcke's yearly salary.

53. Similarly between May 7, 2015 and May 8, 2015, Bown sold 231,350 shares of VASCO stock, *68.1% of his holdings*, at a price between $24.08 and $24.84 per share. This resulted in proceeds to Bown of $5,695,259, which was $5,355,259 more than his yearly salary.

- 18 -

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

D.    **The Truth Emerges**

*July 28, 2015 – Earnings Call*

54.    On July 28, 2015, Defendants Hunt and Bown held an earnings conference call on behalf of the Company to discuss the earnings reports that the Company had released that day for the second quarter of fiscal 2015 (the "Q2 2015 Earnings Call"). Valcke did not participate on the call because of a purported fire at his personal residence.

55.    During the Q2 2015 Earnings Call, Hunt stated, in pertinent part:

Revenues related to our delivery of all products sold to Rabobank globally exceeded 30% of our second quarter revenue, as they did in the first quarter. ***Combined revenues from all other customers, excluding Rabobank decreased less than 10% for the second quarter of 2015*** and increased by less than 5% for the six months of 2015 when compared to 2014.

***We anticipate that our revenue for the second half of 2015, excluding Rabobank will remain essentially flat when compared to 2014.***

As noted, in previous calls, our current sales and licensing business model create situations where are quarter-to-quarter to results are uneven. While we are providing information on revenues from customers excluding Rabobank, we view the results on a consolidated basis.

We consider the Rabobank transaction to be consistent with our business model where our customers often replace products previously purchased from us with products that are easier to use and more secured.

Consistent with our business model, while some customers are doing major new rollouts, such as Rabobank, others are completing rollouts and moving into a maintenance mode. It is the sustainable, repeatable nature of our revenue stream.

Also while it is appropriate to note that ***revenues from customers, excluding Rabobank is expected to be flat for full year 2015 compared to full year 2014***, we believe that are pipeline of opportunities for future sales of our products, including products with our newer technology remain strong.

Q2 2015 Earnings Call.

56.    Additionally, in response to an Analysts questions regarding the Company's second half revenue and pipeline, Bown stated in pertinent part:

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

**Cliff Bown**

Yes, Joe, it's Cliff. Couple of other comments for you is obvious from the guidance that we gave, we're anticipating that Q or ***the second half of this year revenue wise is going to be lower***, but you also know from following us for a long time that our operating expense space is relatively stable, currency excluded.

Q2 2015 Earnings Call.

57.     Additionally, in response to an Analysts questions regarding the Company's second half revenue and pipeline, Hunt revealed that hardware sales were in decline. Hunt stated in pertinent part:

In terms of numbers, ***we are really driven by the number of units that we sell some hardware and that's declining*** because mobile banking software is becoming much more popular. We've got the products that makes it easy to support mobile banking as an example, so that's just the way we do it. I can't really comment on the number of customers as Cliff said, that wouldn't be meaningful.

Q2 2015 Earnings Call.

58.     Additionally, in response to an Analysts questions regarding the Company's revenue and pipeline, Bown revealed that they had not been successful in creating term licensees or recurring revenue. Bown stated in pertinent part:

***Fred I would offer the interpretation that we haven't been widely successful in creating term licensees or recurring revenue.*** With those products I think those do provide good opportunities for moving from a sales and license model, to a recurring revenue model but lot of the customers we have talked to, have been existing customers and they are more familiar with sales and licensing than they are term revenue.

So the deferred revenue balances that you're seeing today are primarily due to maintenance and items that didn't meet revenue recognition criteria at the end of the quarter.

Q2 2015 Earnings Call.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

59.     Additionally, in response to an Analysts questions regarding Rabobank follow-on orders in the second half and non-Rabobank revenue, Bown stated in pertinent part:

> I think part of the answer there Josh is, **we don't know what the follow on orders would be,** they continue to order the old technology that they had, at the same time they're ordering the new technology. The other way they were rolling it out was new technology to existing customers most important customers, the old technology to new customers were coming on, only with the idea that in the short time they were going to replace that old technology with the new but they just needed to buy more.
>
> *      *      *
>
> Well, in the prepared remarks we said that the, **it was a decline in the second quarter, and we said it was a decline of less than 10%** on a year-to-date basis it was still an increase but an increase of less than 5%.

Q2 2015 Earnings Call.

60.     These statements revealed the truth to the market about VASCO's non-Rabobank revenue outlook and pipeline for the remainder of the year. Specifically, Individual Defendants revealed that revenues from non-Rabobank customers *decreased* for the second quarter when compared to 2014, and that "revenues from customers, excluding Rabobank is expected to be flat for full year 2015 compared to full year 2014." Additionally, in response to analysts' questions related to revenue pull-back Defendants admitted that 1) "we're anticipating that Q or the second half of this year revenue wise is going to be lower," 2) that "[VASCO] haven't been widely successful in creating term licensees or recurring revenue," 3) "we are really driven by the number of units that we sell some hardware and that's declining," and 4) they "don't know what the follow on orders will be" in regard to Rabobank orders.

61.     Dougherty & Company LLC also released an analyst report on July 29, 2015 lowering its price target and indicating that the information VASCO revealed to the market may drive down the price of VASCO shares. For instance, the report states that "VDSI's shares may

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

come under pressure today driven by commentary stating revenue ex-Rabobank will be approximately flat y/y in 2015 . . . ." Further, Topeka Capital Markets indicated they were lowering their price target because "Vasco will try and make up some of the estimated $50mm in revenues in 2015 from Rabobank that will not repeat in 2016." Topeka also states, "revenue for Vasco in 2H15 will trail 1H while guided to be flat YoY excluding Rabobank activity."

62.     In response to this news, VASCO stock declined from $26.55 per share at close on July 28, 2015, to $20.45 per share at close on July 29, 2015.  This resulted in a drop of 22.97% in one trading day on unusually heavy volume.

**E.     Defendants Acted with Scienter**

*Defendants Profited from the Misrepresentations*

63.     Atypical stock sales are highly indicative of a strong, cogent, and compelling inference of scienter. Here, both Bown and Valcke made large atypical sales just days after the misrepresentation and mere months prior to the corrective disclosure. For example, Valcke made large atypical sales between May 1, 2015 and May 4, 2015. Valcke sold 120,000 shares of VASCO stock, *23.1% of his holdings*, at a price between $25.50 and $26.20 per share.  This resulted in proceeds to Valcke of $3,113,500.  Had Valcke waited until after the truth was revealed and the stock dropped to $20.45 on July 29, 2015 and further to $18.51 on August 3, 2015, Valcke would have only received between $2,454,000 and $2,221,200. This would have resulted in a personal loss to Valcke of between $659,500 and $892,300, respectively.

64.     Similarly, between May 7, 2015 and May 8, 2015, Bown sold 231,350 shares of VASCO stock, *68.1% of his holdings*, at a price between $24.08 and $24.84 per share. This resulted in proceeds to Bown of $5,695,259.  Had Bown waited until after the truth was revealed and the stock dropped to $20.45 on July 29, 2015 and further to $18.51 on August 3, 2015, Bown would

- 22 -

have only received between $4,731,107 and $4,282,288. This would have resulted in a personal

loss to Bown of between $964,152 and $1,412,970, respectively.

65. These stock sales were atypical and highly indicative of scienter because neither

Valcke nor Bown had previously, or since, made any other sales of VASCO stock. Additionally,

timing of the sales and the amount and percentages sold are highly indicative of scienter. The

sales occurred just days after the misrepresentation while VASCO stock was inflated and just

months before the Company revealed that non-Rabobank revenue would be flat for the remainder

of 2015.

66. Additionally, the amount and percentages of sales were atypical and resulted in

amounts to both Valcke and Bown that were highly material as Valcke's base salary was $442,000

while Bown's base salary at the time was $340,000. Accordingly, the amounts that Valcke and

Bown profited (by avoiding losses) were significant in comparison to their respective salaries.

Thus, the fact that these sales were so enormous in size and amount is indicative that Valcke and

Bown knew the truth about VASCO's revenue and pipeline issues and decided to sell their shares

while the market was still inflated.

### *The Company Continually Monitored the Pipeline*

67. The fact that the Individual Defendants paid close attention to the pipeline is also

highly indicative that the Individual Defendants knew that non-Rabobank revenue was in decline

and that the statements about the pipeline were misleading. For example, the following statements

were made by the Individual Defendants on the Q1 2015 Earnings Call:

- Hunt (Q1 2015 Earnings Call) – "Due to the strong performance and strong pipeline

 of potential new orders our expectations for the year have increased and this is

- 23 -

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

reflected in our increased guidance which we will discuss in more detail later in the call."

- Hunt (Q1 2015 Earnings Call) – "This is based on our strong first quarter and having greater visibility into our pipeline of potential new orders for both our traditional and new products."

- Hunt (Q1 2015 Earnings Call) – "We're finding a very strong reception and interest in the Cronto sign products as well as DIGIPASS for apps."

- Hunt (Q1 2015 Earnings Call) – "We're also seeing additional growth in our sales pipeline. While not every opportunity can be converted into a revenue we believe that our sales pipeline at one of the strongest point in our company's history. Our backlog remained strong, we're pleased with a number of proof of concept and product evaluations that are being conducted with our Cronto based and DIGIPASS mobile application security solutions."

- Valcke (Q1 2015 Earnings Call) – "We're also seeing additional growth in our sales pipeline. While not every opportunity can be converted into a revenue we believe that our sales pipeline at one of the strongest point in our company's history. Our backlog remained strong, we're pleased with a number of proof of concept and product evaluations that are being conducted with our Cronto based and DIGIPASS mobile application security solutions."

- Valcke (Q1 2015 Earnings Call) – "And indeed like Ken is mentioning we see a nice and a strong demand basically for us as well our DIGIPASS for apps products as well for over DIGIPASS based on the Cronto technology."

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

- Bown (Q1 2015 Earnings Call) – "The 10K that we filed indicated that the Rabobank order started in the third quarter of 2014 and was scheduled to be completed in the third quarter of 2015. However our history with Rabobank has been that we get follow on orders after the initial roll out. So while we don't have orders in hand and in backlog today that go beyond the third quarter of 2015 we would expect that there will be either orders in the fourth quarter or in 2016 that have similar products."

68. These statements show that the Individual Defendants routinely monitored the pipeline and the Company's non-Rabobank revenue closely. Thus, the Individual Defendants knew non-Rabobank revenue was in decline and that the increase in guidance was solely due to Rabobank revenue.

## F.   Loss Causation

69. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of VASCO shares and operated as a fraud or deceit on Class Period purchasers of VASCO shares by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of VASCO shares fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of VASCO shares during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

70. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of VASCO's non-Rabobank revenue and pipeline. Defendants' false and misleading statements and omissions had the intended effect and caused VASCO shares

to trade at artificially inflated levels throughout the Class Period, reaching as high as $34.63 per share on June 22, 2015, before falling to $18.51 per share on August 3, 2015 – a decline of 46.5%.

71.     The precipitous decline in the price of VASCO's shares was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the price of VASCO's shares negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of VASCO shares and the subsequent significant decline in the value of VASCO shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## NO SAFE HARBOR

72.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein misrepresented VASCO's non-Rabobank revenue and pipeline during the Class Period and, therefore, relate to then-existing facts and conditions. In addition, as the false and/or materially misleading statements were known to be false at the time they were made, they were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

73.     To the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of V who knew that the statement was false when made

## FRAUD-ON-THE-MARKET DOCTRINE

74.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

      (a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

      (b)     the omissions and misrepresentations were material;

      (c)     the Company's stock traded in an efficient market;

      (d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

      (e)     Plaintiff and the other members of the Class purchased VASCO common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

75.     At all relevant times, the market for VASCO common stock was an efficient market for the following reasons, among others:

      (a)     VASCO common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

      (b)     as a regulated issuer, VASCO filed periodic public reports with the SEC and NASDAQ;

      (c)     VASCO regularly communicated with public investors via established market communication mechanisms, including through regular

- 27 -

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    VASCO was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

76.    As a result of the foregoing, the market for VASCO common stock promptly digested current information regarding VASCO from all publicly available sources and reflected such information in the prices of VASCO common stock. Under these circumstances, all purchasers of VASCO common stock during the Class Period suffered similar injury through their purchase of VASCO common stock at artificially inflated prices and a presumption of reliance applies.

77.    A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding VASCO's non-Rabobank revenue and pipeline – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

78.    Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or acquired VASCO common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of VASCO, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

80.     The members of the Class are so numerous that joinder of all members is impracticable, since VASCO has millions of shares of stock outstanding and because VASCO's shares were actively traded on NASDAQ. As of October 26, 2016, VASCO had 40,196,944 shares issued and outstanding. While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

81.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)     whether the Act was violated by Defendants;

(b)      whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

(e)      whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)      whether the price of VASCO common stock was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)      whether the members of the Class have sustained damages as a result of the decrease in value of VASCO's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

82.      Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

83.      Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

84.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### Count I

**Violation of Section 10(b) of the Act and SEC Rule 10b-5 against Defendants**

85.      Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

86.      During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.     Defendants violated §10(b) of the 1934 Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5], in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon VASCO's common stockholders during the Class Period.

88.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased VASCO's common stock at artificially inflated prices. Plaintiff and the Class would not have purchased VASCO's common stock at the prices they did, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

89.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of VASCO common stock during the Class Period.

## Count II

**Violation of Section 20(a) of the Act against the Individual Defendants**

90.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

91.     The Individual Defendants acted as controlling persons of VASCO within the meaning of §20(a) of the Act, as alleged herein. By reason of their high-level positions with VASCO, their ownership of VASCO common stock, their participation in and/or awareness of

VASCO's operations and/or intimate knowledge of the false and materially misleading statements filed by VASCO with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control (and did influence and control), directly or indirectly, the decision-making of VASCO, and caused VASCO to engage in the wrongful conduct complained of herein, including the dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had access to: VASCO's reports, press releases, public filings and other information and statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of VASCO and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

92.    As set forth above, Defendants violated §10(b) of the Act and SEC Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Moreover, by virtue of their positions as controlling persons, the Individual Defendants had the power and authority to, and did, cause VASCO to engage in the wrongful conduct alleged.

93.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their sales of VASCO's common stock during the Class Period. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

(A) Determining this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class representatives, and designating Lead Counsel as Class Counsel;

(B) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

(C) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D) Awarding such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

[Signature block on following page]

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605

Dated: January 30, 2017    Respectfully submitted,


         /s/ Andrew C. Murphy

         Vincent L. DiTommaso
         Peter S. Lubin
         Andrew C. Murphy
         DITOMMASO ♦ LUBIN, P.C.
         17W 220 22nd Street, Suite 410
         Oakbrook Terrace, Illinois 60181
         (630) 333-0000 Telephone
         (630) 333-0333 Facsimile


         **LEVI & KORSINSKY, LLP**

         NICHOLAS I. PORRITT
         ADAM M. APTON
         ADAM C. MCCALL
         1101 30th Street N.W., Suite 115
         Washington, D.C. 20007
         Tel: (202) 524-4290
         Fax: (202) 333-2121
         Email: nporritt@zlk.com
         Email: aapton@zlk.com
         Email: amccall@zlk.com

         *Attorneys for Lead Plaintiff*
         *and Lead Counsel for Class*

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS
Case No. 1:15-cv-06605