**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LINDA J. ROSSBACH, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> VASCO DATA SECURITY, INTERNATIONAL INC., T. KENDALL HUNT, CLIFFORD K. BOWN, and JAN VALCKE, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) )  No. 15-cv-06605 <br><br> Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

In this putative class action, Lead Plaintiff John Bunk seeks to represent a class of

investors who purchased or acquired common stock issued by Defendant VASCO Data Security

International, Inc. ("VASCO") between April 28, 2015, and July 28, 2015. In April 2015, a

substantial portion of VASCO's revenues came from its business with Rabobank. According to

Plaintiff, beginning in April 2015, Defendants VASCO, T. Kendall Hunt, Clifford K. Brown, and

Jan Valcke misled investors by making positive statements about future non-Rabobank revenue

that would be coming in during the second fiscal quarter of 2015. Plaintiff contends that the

misleading statements caused VASCO's stock price artificially to rise and that, on July 28, 2015,

when Defendants disclosed limited non-Rabobank revenue, the stock price fell. Plaintiff further

contends that two of the individual Defendants profited by selling stock during the class period.

Now before this Court are motions to dismiss the complaint for failure to state a claim brought

by Defendants VASCO, Hunt, and Bown (Dkt. No. 61) and Defendant Valcke (Dkt. No. 70).

Also before the Court is Plaintiff's motion to strike Defendants' request for judicial notice or, in

the alternative, to convert the motions to dismiss into summary judgment motions. (Dkt. No. 75.) For the reasons explained below, the motions to dismiss are granted and Plaintiff's claims dismissed without prejudice. The motion to strike is denied.

## BACKGROUND

Unless otherwise indicated, the following facts are taken from Plaintiff's amended complaint and accepted as true for purposes of the instant motions.

VASCO is an IT security company that designs, develops, and markets security solutions that secure and manage access to digital assets and protect transactions. (Am. Compl. ¶ 2, Dkt. No. 57.) During the relevant period, Hunt was VASCO's Chief Executive Officer, Bown was VASCO's Chief Financial Officer, and Valcke was VASCO's President and Chief Operating Officer. (*Id.* ¶¶ 14–16.)

In 2013, VASCO acquired Cronto Limited ("Cronto") and its product that attempts to assure that financial transactions have not been compromised or hacked. (*Id.* ¶ 22). VASCO subsequently integrated the Cronto solution into its own security platforms. (*Id.*) VASCO's multi-factor user authentication is delivered through VASCO's hardware and software DIGIPASS security products. (*Id.* ¶ 25). In 2014, VASCO sold card readers to Rabobank, which began shipping in the third quarter of 2014. (*Id.* ¶ 2). In 2014, Rabobank contributed 12% of VASCO's worldwide revenue; in 2015, that percentage rose to 30%. (*Id.* ¶ 30).

Plaintiff contends that, beginning in April 2015, Defendants made false and misleading statements about future non-Rabobank revenue. On April 28, 2015, VASCO issued a press release disclosing its first quarter earnings results for fiscal year 2015 ("Q1 2015 Press Release"). (*Id.* ¶ 37). In the Q1 2015 Press Release, VASCO stated, in relevant part, the following: "Revenue is expected to be in the range of $230 million to $240 million, compared to

$220 million to $230 million communicated previously. . . ." (*Id.*) The Q1 2015 Press Release

also contained the following statement:

> "We are pleased with the results of the first quarter," stated T. Kendall Hunt, Chairman & CEO. "Revenue reported for the first quarter of 2015 was the highest of any quarter in our history and reflected both the delivery of a significant amount of card readers using our new Cronto technology to Rabobank, which was part of our record backlog at the beginning of the year, and a significant increase in revenues from other customers in the quarter. Revenues related to our delivery of all products sold to Rabobank globally exceeded 30% of the first quarter's revenue while the combined revenues from all other customers in the first quarter of 2015 increased more than 15% over the first quarter of 2014. We are also increasing our guidance for the full-year 2015 revenue based on the strength of our first quarter results *and strong pipeline of potential new orders for both our traditional and new products*. We expect that our mobile solutions, DIGIPASS for Apps and DIGIPASS for Mobile, and solutions based on our Cronto technology will continue to make important contributions to our revenues in 2015 and beyond. As noted previously, and as evident from our current guidance, we expect that comparisons of 2015 results to the prior year will be stronger in the first half of this year than in the second half."

(*Id.* (emphasis in original)). On April 28, 2015, VASCO held an earnings conference call ("Q1

2015 Earnings Call") to discuss the earnings reports that VASCO had released that day. (*Id.*

¶ 38). During the Q1 2015 Earnings Call, Hunt stated the following:

> Due to *the strong performance and strong pipeline of potential new orders our expectations for the year have increased* and this is reflected in our increased guidance which we will discuss in more detail later in the call. We believe that this quarter reflects three of the key elements of our business strategy. The first key element is to provide products that have leading edge technology that not only increases the level of security for our customers but also increases the users' convenience. The second key element is to generate *a continuing sustainable repeatable revenue stream* from existing customers as a replace and/or upgrade the level of security of the products they use and third key element is to expand our market by adding new customers.

(*Id.* ¶ 39 (emphasis in original)). During the same call, Hunt went on to state:

> At this time I would like to highlight our guidance for 2015. VASCO is increasing it's guidance for revenue for the full year of 2015. We currently believe that our revenue will be in the range of $230 million to $240 million compared to $220 million to $230 million communicated previously. This is based on our strong first quarter *and having greater visibility into our pipeline of potential new*

*orders for both our traditional and new products*. We expect that our mobile solutions DIGIPASS for apps and DIGIPASS for mobile and solutions based on our Cronto technology will continue to make important contributions to our revenue in 2015 and beyond. As has been our recent practice we continue to provide annual guidance only given the fact that quarterly comparisons to any prior period are challenging given our sales and licensing model. Within that context as noted previously and as evident from our current guidance we expect the comparisons of 2015 results to the prior year will be stronger in the first half of this year than in the second half.

(*Id.* (emphasis in original)) Hunt further stated during the Q1 2015 Earnings Call:

We're finding *a very strong reception and interest in the Cronto sign products as well as DIGIPASS for apps*. I would like Jan, to give you a little more color however. . . And without giving you numbers one of the ways we -- number of proof of concepts that are underway where our customer has brought in our solution and is judging the reception of their customers by how they like the product so that's also a very strong indicator. The number of proof of concepts that we have underway right now.

(*Id.* ¶ 42 (emphasis in original)).

Bown also spoke during the Q1 2015 Earnings Call, including stating the following:

The increase in revenue from the banking market reflected both delivery of a significant amount of card readers using our new Cronto technology to Rabobank *and a significant increases in revenues from other customers in the quarter*. The increase in revenues from the enterprise and application security market primarily reflects growth and maintenance in support revenues. The comparison of revenues was also impacted by changes in currency rates during the period. U.S. dollar on average strengthened approximately 19% against the euro for the quarter ended March 31, 2015 when compared to the same period in 2014.

(*Id.* ¶ 41 (emphasis in original)). Bown also stated during the Q1 2015 Earnings Call that:

The 10K that we filed indicated that the Rabobank order started in the third quarter of 2014 and was scheduled to be completed in the third quarter of 2015. However *our history with Rabobank has been that we get follow on orders after the initial roll out*. So while we don't have orders in hand and in backlog today that go beyond the third quarter of 2015 *we would expect that there will be either orders in the fourth quarter or in 2016 that have similar products*. In terms of the amount of revenue that would come in Q2 versus Q1, or Q3 versus Q2, at this point we're about half way maybe a little over halfway through that initial order. So I guess the answer without getting quarter specific as we don't want to give quarter guidance is between second and third quarter, we should see volume

similar to what we have seen since the third quarter of 2014 through the end of the first quarter of 2015.

(*Id.* ¶ 42 (emphasis in original)).

Finally, during the same Q1 2015 Earnings Call, Valcke stated the following:

> We're also seeing additional growth in our sales pipeline. While not every opportunity can be converted into a revenue we believe that our sales pipeline at one of the strongest point in our company's history. Our backlog remained strong, we're pleased with a number of proof of concept and product evaluations that are being conducted with our Cronto based and DIGIPASS mobile application security solutions.

(*Id.* ¶ 40). Valcke went on to explain:

> On the DIGIPASS for apps you need to see that today the Cronto is completely integrated in that suite of products. So if we talk about DIGIPASS for apps, an option for customers is also to use that Cronto technology if it comes to client software. If it comes to the hardware devices we have of course the whole suite of products where Cronto is a part of it. And indeed like Ken is mentioning we see a nice ***and a strong demand basically for us as well our DIGIPASS for apps products as well for over DIGIPASS based on the Cronto technology***. We see that in Europe but we that also in Asia and let's says in North America we see mainly the software based solutions as a demand.

(*Id.* ¶ 42 (emphasis in original)). Valcke further stated: "I should say about the proof of concepts in general let me, I don't want to give too much specifics about the proof of concept is probably 50% higher than six months to a year ago." (*Id.*).

On May 5, 2015, VASCO filed a quarterly report on Form 10-Q with the Securities and Exchange Commission ("SEC"), reporting the financial and operating results for the quarter ending March 31, 2015 ("1Q 2015 Form 10-Q") and stating in relevant part:

> Total revenue in the first quarter of 2015 increased $26,312 or 68% from first quarter of 2014. The increase in revenue in the first quarter of 2015 compared to the first quarter of 2014 reflected both the delivery of a significant amount of card readers using our new Cronto technology to Rabobank, which was part of our backlog at the beginning of the year, ***and a significant increase in revenues from other customers in the quarter***. Revenues related to our delivery of all products sold to Rabobank globally exceeded 30% of the first quarter's revenue in 2015 while the combined revenues from all other customers in the first quarter of 2015

increased more than 15% over to the first quarter of 2014. As noted in our annual report on Form 10-K for the year ended December 31, 2014, the order from Rabobank for card readers incorporating our Cronto technology began shipping in the third quarter of 2014 and is scheduled to be completed in the third quarter of 2015.

Revenue generated in EMEA for the first quarter of 2015 was $20,580 or 77% higher in the first quarter of 2015 than in the first quarter of 2014. The increase reflected an increase of approximately 95% in revenue from the Banking market and a 5% increase in revenue from the Enterprise and Application Security market. The growth of revenues in the Banking market was primarily attributable to sales of card readers that use our Cronto technology.

(*Id.* ¶ 49 (emphasis in original)).

After making the allegedly false and misleading statements, Valcke and Bown personally profited from rising stock prices by selling their stock in May 2015. (*Id.* ¶¶ 52–53). On July 28, 2015, Defendants held an earnings conference call to discuss the earnings reports that VASCO had released that day for the second quarter of fiscal 2015 ("Q2 2015 Earnings Call"). (*Id.* ¶ 54). Plaintiff contends that Defendants admitted at that time that non-Rabobank revenue would remain essentially flat when compared to 2014 and that VASCO had not been successful in creating term licensees or reoccurring revenue. (*Id.* ¶¶ 55–58). Plaintiff further contends that the statements during the Q2 2015 Earnings Call concerning non-Rabobank revenue caused the stock price to fall. (*Id.* ¶¶ 60–61). Ultimately, Rabobank's yearly revenue for fiscal 2015 actually exceeded the $240 million forecast made by Defendants, ending up at $241.4 million. (Hennessy Decl., Ex. I, Dkt. No. 62-10.)

Based on these allegations, Plaintiff's amended class action complaint asserts claims for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (Count I); as well as violations of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (Count II).

**DISCUSSION**

In analyzing a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in favor of the plaintiff. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014).

Section 10(b) provides in part that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 provides the following:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. For a claim arising under Section 10(b) and Rule 10b-5, a plaintiff must typically establish: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008)).

Furthermore, since Section 10(b) claims sound in fraud, a plaintiff bringing such a claim must plead with particularity under the heightened pleading standard in Federal Rule of Civil Procedure 9(b). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); Fed. R. Civ. P. 9(b) (stating that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake"); *see also Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (stating that "Rule 9(b) requires a pleading to state with particularity the circumstances constituting fraud" and that "'ordinarily requires describing the who, what, when, where, and how of the fraud'") (quoting in part *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736–37 (7th Cir. 2014)).

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.* also imposes additional heightened pleading standards for Section 10(b) claims. *Tellabs, Inc.,* 551 U.S. at 320 (explaining that "[d]esigned to curb perceived abuses of the § 10(b) private action—nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers, . . . the PSLRA installed both substantive and procedural controls") (internal quotations omitted) (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)). Pursuant to the PSLRA, "[i]n any private action arising under this chapter in which the plaintiff alleges that the defendant-- (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

## I.     False and Misleading Statements and Omissions

Plaintiff here asserts that Defendants made false and misleading statements in the Q1 2015 Press Release, during the Q1 2015 Earnings Call, and in the 1Q 2015 Form 10-Q.

### A.     Vague Block Quotes

Plaintiff presents a series of block quotes in the amended complaint but fails to properly plead what portions of the quotations were false and misleading. As indicated above, the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading. . . ." 15 U.S.C. § 78u-4(b)(1). In the amended complaint, Plaintiff presents a series of long block quotes from statements allegedly made by Defendants in April 2015 and May 2015. (Am. Compl. ¶¶ 37, 39– 42, 48). The lengthy quotes cover a variety of factual matters. For example, the quoted portions of the Q1 2015 Press Release addresses matters including annual revenue, operating income as percentage of revenue, backlog, revenue from Rabobank, and contributions from DIGIPASS to revenue. (*Id.* ¶ 37). It is not clear what matters in that statement Plaintiff contends are false and misleading or why. Although Plaintiff has bolded and italicized some portions of some of the block quotations, it is not clear whether such emphasis was intended to indicate that such portions were the only portions that Plaintiff believes were false and misleading or whether such portions were the most egregious examples. That Plaintiff has also included some block quotations in the amended complaint with no bolded or italicized text only creates further confusion. (*See id.* ¶ 42) (referring to Hunt's statement regarding the number of proof-of-concepts underway).

It is of the utmost importance for Plaintiff to properly pinpoint what Defendants said that Plaintiff believes to have been unlawful, and the PSLRA requires a specific explanation as to why each specific statement was false and misleading. Plaintiff's approach of presenting long

block quotes and general references to matters such as non-Rabobank revenues and the VASCO pipeline are not sufficient. Plaintiff's claims thus fail at the outset for lack of specificity. The Court further notes that, in regard to pointing specific quotations to show scienter in the amended complaint, Plaintiff has done a better job. Yet even in that portion of the amended complaint, Plaintiff begins the list of quotations by stating "[f]or example," indicating that there may be other statements somewhere in the amended complaint that also are pertinent. (*Id.* ¶ 67). Nor does Plaintiff adequately explain why each statement on the long list was false and misleading. There should not be any guesswork in identifying what statements are at issue in this case. Rule 9(b) and the PSLRA require more.

### B.     Future Non-Rabobank Revenue

Plaintiff also alleges that Defendants misled investors about future non-Rabobank revenue that was coming in the second quarter of 2015. Plaintiff contends that the statements quoted in the amended complaint were misleading "because they represented to the public that VASCO's non-Rabobank revenue was currently and would continue to remain 'strong.'" (Pl. Opp. at 4, Dkt. No. 74). Plaintiff further asserts that "Defendants made these material misrepresentations about non-Rabobank revenue while knowing that the present non-Rabobank revenue was already in a material state of decline." (Pl. Opp. at 2.) Throughout his filings, Plaintiff repeatedly indicates that Defendants made representations in April 2015 and May 2015 about future non-Rabobank revenue. However, a review of the amended complaint reveals no such allegations of statements by Defendants relating to future non-Rabobank revenue in the second quarter of 2015. *See Alizadeh v. Tellabs, Inc.*, No. 13 C 537, 2014 WL 2726676, at *5 (N.D. Ill. June 16, 2014) (explaining that "[p]uzzle pleading has also been described as a 'not

uncommon mask for an absence of detail'") (quoting *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1011 (N.D. Ill. 2004)).

Plaintiff quotes the Q1 2015 Press Release, which referenced non-Rabobank revenue, but that reference was to revenue in past quarters, not future revenue. (*See* Am. Compl. ¶ 37.) Unlike a situation where a plaintiff alleges statements and cannot adequately explain why the statements are false or misleading, in this case, Plaintiff has actually explained why certain statements were false and misleading but fails to allege that such statements were ever made. Plaintiff has thus failed to meet the pleading requirements of the PSLRA. Either Plaintiff neglected to present such allegations in their amended complaint or Plaintiff's arguments are based upon his own inferences drawn from Defendants' statements rather than any actual statements made by Defendants. Either way, that is the type of vague non-specific pleading that the PSLRA prohibits.

Nor would Plaintiff's inferences be justified based upon their own pleadings. Plaintiff alleges that Defendants referenced a "pipeline" of potential business, which Plaintiff appears to equate with future non-Rabobank revenue. During the Q1 2015 Earnings Call, Hunt referenced a "strong pipeline of potential new orders." (*Id.* ¶ 39). Valcke also referenced a strong "sales pipeline" during the call. (*Id.* ¶ 40). Such statements referenced potential future business, which is not the same as expected revenue. Nor did Hunt or Valcke specify that the pipeline of which they were speaking consisted of potential non-Rabobank revenue, as Plaintiff assumes. Based on Plaintiff's own allegations, it is evident that the term "pipeline" was not synonymous with future non-Rabobank revenue. As Plaintiff himself alleges, VASCO's "main method to generate pipeline [was] to work with existing customers." (*Id.* ¶ 32). VASCO "hope[d] the existing customers w[ould] issue a request for information" and VASCO would then "begin a proof-of-

concept." (*Id.*). After completion of the "proof-of-concept phase," VASCO would "make a proposal and hope that the old customer renew[ed] its hardware." *Id.* According to Plaintiff's own allegations, the "pipeline" in April and May 2015 would have consisted of potential orders from all existing customers, including Rabobank. Thus, Plaintiff's assertion that the term "pipeline" referred exclusively to non-Rabobank revenue is contradicted by his own allegations.

Plaintiff's allegations also show that the pipeline represented potential future business that VASCO "hope[d]" it would get. (*Id.*) It did not represent any certain future revenue in the second quarter of 2015. Defendants correctly point out that the pipeline and future revenue are separate and distinct matters. Plaintiff himself acknowledges the distinctions between a pipeline and revenue. In regard to Rabobank, the contract was to be filled through the third quarter of 2015, and that revenue only was realized after the product orders were filled. Similarly, with regard to any new orders from non-Rabobank customers in early 2015, such orders might have been made, but if the orders were not filled, for example, until 2016, the revenues might not have been realized until that later time. A statement that there was a strong pipeline in April 2015 and May 2015, did not necessarily mean that there was an upcoming revenue stream that would arrive in the second quarter of 2015. Thus, Plaintiff has failed to adequately plead facts sufficient to show that false or misleading statements were made in regard to future non-Rabobank revenue.

### C. Upcoming Revenue Stream

Plaintiff also alleges that Hunt made a false statement about an upcoming revenue stream in the second quarter of 2015. As indicated above, during the Q1 2015 Earnings Call, Hunt referenced "a continuing sustainable repeatable revenue stream" in April 2015. (Am. Compl. ¶ 39). Plaintiff explains that Hunt's statement was misleading because he "touted the Company's

ability to create 'a continuing sustainable repeatable revenue stream.'" (*Id.* ¶ 44). Plaintiff, however, takes Hunt's words out of context in making such an argument. In the statement referenced by Plaintiff, Hunt was discussing VASCO's "business strategy" and the "second key element" of that strategy was "to generate a continuing sustainable repeatable revenue stream from existing customers." (*Id.*). Hunt appears merely to have been representing that VASCO was intending as part of its business strategy in the second quarter of 2015 to generate a continuing revenue stream from existing customers. Hunt does not appear to be making any promise that VASCO had such new customers lined up or that he knew VASCO was going to be successful in its efforts. Plaintiff thus has failed to allege facts that would show that Hunt misrepresented VASCO's business strategies in any way at that juncture.

### D. Historical Facts

Plaintiff also accuses Defendants of making statements relating to historical facts that were false and misleading. Specifically, Plaintiff alleges that during the Q1 2015 Earnings Call Bown referenced "significant increases in revenues from other customers in the quarter." (*Id.* ¶ 41). Although Plaintiff appears to infer from that reference that Bown was forecasting the future in the second quarter of 2015, it is apparent from a review of Bown's entire statement that he was commenting on a past historical fact. Bown stated the following: "The increase in revenue from the banking market reflected both delivery of a significant amount of card readers using our new Cronto technology to Rabobank and a [sic] significant increases in revenues from other customers in the quarter." (*Id.*). Bown was speaking in the past tense and thus referring to a prior quarter and giving historical facts, not predicting results in a future quarter. Plaintiff offers no facts that show that Bown misrepresented the revenues in regard to a past quarter.

Plaintiff also contends that in the 1Q 2015 Form 10-Q, Hunt and Bown referenced a "significant increase in revenues from other customers in the quarter." (*Id.* ¶ 49). A review of the entire quoted statement by Hunt and Bown shows that they were comparing the revenue of the first quarter in 2014 to the first quarter in 2015. (*Id.*). They were not forecasting future revenue in the second quarter of 2015. Plaintiff has not offered any facts that would indicate that Hunt and Bown misrepresented the revenue in regard to such a comparison of past quarters.

### E.    Potentially Actionable Statements

As explained above, Plaintiff has failed to identify properly the statements that are alleged to be false and misleading or to provide adequate explanations as to why such statements are false and misleading. The Court notes, however, that the alleged references in statements by Defendants to an existing "pipeline" of potential business, "demand" for future products, "expect[ations]" for future orders, "reception" to certain products, and "interest" in future products could potentially be actionable statements. (*Id.* ¶¶ 37, 39, 40, 42). It is possible that such statements were made about an existing and verifiable set of facts in April 2015 and May 2015. Defendants are correct that it may be such statements were not material but instead mere vague puffery on the part of VASCO, which would not be actionable. It would be premature at the motion to dismiss stage to make such a determination under the set of facts presented in this case. *See S.E.C. v. Bauer*, 723 F.3d 758, 772 (7th Cir. 2013) (explaining that the materiality "determination requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact," and that "[o]nly if the established omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law")

(quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)); *S.E.C. v. Cook*, No. 1:13-cv-01312, 2015 WL 5022152, at *19 (S.D. Ind. Aug. 24, 2015) (stating that "[t]he issue of materiality can be resolved on summary judgment when the misrepresentations 'are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality'") (quoting *TSC Indus.*, 426 U.S. at 450).

## F. Alleged Omissions

Plaintiff also alleges that Defendants made misleading omissions. Plaintiff, however, fails to specify what the omissions were on the part of Defendants. As with the alleged false and misleading statements, the Court will not speculate as to the source of Plaintiff's claims relating to material omissions. Plaintiff has thus failed to plead sufficient facts relating to any alleged misleading omissions.

## II. Scienter

Defendants also argue that Plaintiff has not adequately alleged scienter. With respect to the scienter requirement, the PSLRA states that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). The "required state of mind" that must be established is "'knowledge of the statement's falsity or reckless is regard of a substantial risk that the statement is false.'" *Pugh*, 521 F.3d at 693 (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)).

To show a strong inference that the defendant acted with the required state of mind a plaintiff must do more than, "allege facts from which an inference of scienter rationally could be drawn." *Tellabs, Inc.*, 551 U.S. at 323. Rather, a plaintiff must "plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference." *Id.*; *see also S.E.C. v. Ustian*, 229

F. Supp. 3d 739, 774 (N.D. Ill. 2017) (stating that "[s]cienter encompasses either a mental state embracing an intent to deceive, manipulate or defraud, . . . or reckless acts that are not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it") (internal quotations omitted) (quoting *S.E.C. v. Steffes*, 805 F. Supp. 2d 601, 616 (N.D. Ill. 2011) and *S.E.C. v. Randy*, 38 F. Supp. 2d 657, 670 (N.D. Ill. 1999)).

In assessing whether the scienter requirement has been met, a court should "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," and "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.,* 551 U.S. at 323. Also, "the court must take into account plausible opposing inferences." *Id.* at 323–24 (explaining that "[t]he strength of an inference cannot be decided in a vacuum" and "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff"). A plaintiff has met the scienter requirement as long as "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

In the present case, Plaintiff's allegations regarding scienter are almost entirely based on events that occurred ***after*** the class period. Plaintiff points to statements made in April 2015 in the Q1 2015 Press Release, during the Q1 2015 Earnings Call, and in May 2015 in the 1Q 2015 Form 10-Q. Plaintiff then points to subsequent stock prices, corporate disclosures, and financial

results in later quarters as evidence of scienter. This is the type of proof of fraud in hindsight that courts have found to be improper. *See City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) (stating that "'[t]here is no securities fraud by hindsight'") (quoting *Fulton County Employees Retirement System v. MGIC Investment Corp.*, 675 F.3d 1047, 1050–51 (7th Cir. 2012)); *Pugh*, 521 F.3d at 694 (explaining that a "fraud by hindsight argument was . . . rejected" in *Higginbotham v. Baxter International, Inc.*, 495 F.3d 753 (7th Cir. 2007)); *see also Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (stating that the plaintiff was attempting to alleged fraud by hindsight and that "[f]or the most part, plaintiff ha[d] simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones").

The mere fact that the pipeline or other financial hopes did not turn out the way that Defendants expected does not evidence that Defendants deceived investors in April 2015 and May 2015. The only contemporaneous facts to which Plaintiff points in response to the instant motions is one reference by Hunt during the Q1 2015 Earnings Call in April 2015 to a "greater visibility" in deals for "traditional and new products." (Pl. Opp. at 14). Such a vague statement regarding "visibility" in regard to potential new business into the pipeline is a far cry from the type of facts necessary to show that Defendants had the requisite scienter. Plaintiff does not allege contemporaneous facts that show Defendants knew there was not a strong pipeline of potential business in April 2015 and May 2015.

Nor does Plaintiff even allege facts that would properly indicate fraud in hindsight. For example, Plaintiff relies upon facts relating to decreases in the second quarter of 2015 in non-Rabobank revenue to show that Defendants knew that there was no pipeline of potential business at the start of the quarter. As explained above, however, the pipeline did not exclusively consist

of non-Rabobank customers and any statements about the pipeline did not necessarily equate to statements about future revenue in the second quarter of 2015. Also, as explained further below, VASCO's stock prices, when viewed in hindsight, do not indicate fraud on the part of Defendants.

Plaintiff argues that the individual Defendants' personal dealings with respect to buying and selling personally-owned VASCO stock show their scienter. But Plaintiff concedes that Hunt did not sell any personal stock during the class period. (Pl. Opp. at 25). Recognizing this deficiency in the allegations, Plaintiff argued that, even if Hunt did not sell any stock, neither is there evidence that Hunt bought any stock during the class period. (*Id.*). The logic behind such an argument is questionable. According to Plaintiff's logic, Hunt was acting suspiciously if he sold stock and he was acting suspiciously if he did nothing. Thus, Hunt was required to purchase stock in order avoid looking suspicious. The law imposes no such burden. Plaintiff also offers for the first time in his opposition brief that Hunt had "motive in the form of an excessive salary." (*Id.*) Yet Plaintiff has failed to allege sufficient facts to support any such assertion that Hunt was acting in a suspicious manner based on his personal dealings with VASCO. Nor may Plaintiff use conduct by other Defendants to hold Hunt individually liable. *See Pugh*, 521 F.3d at 693–94 (explaining that the Seventh Circuit has "rejected the 'group pleading doctrine,' a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations" and "thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant").

With regard to Bown and Valcke, Plaintiff points out that neither of them had ever sold VASCO shares before the class period. (Am. Compl. ¶ 52). Nonetheless, between May 1, 2015 and May 4, 2015, Valcke sold 23.1 % of his holdings at prices between $25.50 and $26.60 per

share. (*Id.*) Between May 7, 2015 and May 8, 2015, Bown sold 68.1% of his holdings at prices between $24.08 and $24.84 per share. (*Id.* ¶ 53). Plaintiff contends that Defendants' statements in April 2015 and May 2015 artificially inflated VASCO's stock prices, and that Bown and Valcke reaped the benefit of the inflated stock prices when they sold their shares. The long-term chart of VASCO stock prices supports no such story, however. While one could argue that Plaintiff's version of what story the stock prices tell is possible and perhaps plausible, Plaintiff carries a much tougher burden to plead scienter under the PSLRA.

On April 2, 2015, the VASCO common stock price opened at $21.73 and over the course of the month it gradually rose to $26.08 at the open on April 27, 2015. (Hennessy Decl., Ex. J, Dkt. No. 62-11). Thus, the day before the first statements at issue in this case, the VASCO stock prices had gradually been rising over the course of the prior month. At the open of April 28, 2015, the stock price had risen to $27.50. On April 28, 2015, Defendants made virtually all the statements that Plaintiff contends were false and misleading and that Plaintiff contends caused an artificial rise in the stock price. Yet at the close of that day, the price had fallen to $26.23. *Id.* The next day the stock price fell at the open to $25.85. The stock price then hovered around the $25 mark. At the beginning of May 2015, Valcke sold his stock, selling the stock at a price lower than the price was at for the open of April 28, 2015, before the statements were made that allegedly artificially inflated stock prices.

Plaintiff contends that Defendants made their final false and misleading statements on May 5, 2015. At the close of that day, however, the price remained around the $25 mark and closed at $25.17. At the open of the next day, the price had risen only 6 cents to $25.23, and at the open of the next day the price fell to $24.56. Bown then sold his stock, again for less than he would have recovered if he had sold the stock at the open on April 28, 2015. Sometime in mid-

May 2015 the stock prices began a gradual rise, getting up to $30 in early June 2015 and getting up to $35 in late June 2015. If Bown and Valcke had inside information that their false and misleading statements were going to artificially inflate stock prices it is unclear why they would not have waited while the stock prices rose to $35. Instead, they sold much earlier and long before the alleged disclosures were made on July 28, 2015 that Plaintiff contends brought the stock prices back down. In early July 2015, the stock prices then began to gradually decrease, falling to $24.84 by the open on July 22, 2015. Thus, the stock prices were already on a decline when the July 28, 2015 statements were made by Defendants. On July 29, 2015, the open price fell to $22.89 and, on August 3, 2015, the open price had fallen to $20.39.

In short, the chart of VASCO's stock prices between April 2, 2015 and August 3, 2015 does not support scienter on the part of Bown or Valcke. If they were engaging in insider trading based on false and misleading information, one would have to infer that they were doing a particularly incompetent job at it, and such inferences are not the type of inferences that will satisfy the "strong inference" standard required in the PSLRA.

 For the Rule 10(b) claims, Plaintiff must do more than simply show that it was plausible Defendants may have had the requisite scienter. Plaintiff must show that there is a strong inference of such scienter, and he has failed to meet that burden. Based on the above, Defendants' motions to dismiss the Section 10(b) and Rule 10b-5 claims are granted and those claims are dismissed without prejudice.

### III. Section 20(a) Claims

Defendants all move to dismiss the Section 20(a) claims. Since Plaintiff has failed to allege sufficient facts to establish any underlying Section 10(b) or Rule 10b-5 claims, Plaintiff cannot pursue the Section 20(a) claims. *Pugh*, 521 F.3d at 693 (stating that "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws— . . ., a violation of § 10(b) and Rule 10b–5"). Therefore, Plaintiff's Section 20(a) claims are also dismissed without prejudice.

### IV. Motion to Strike

Plaintiff moves to strike 14 exhibits attached to a declaration by Mary Ellen Hennessy. (Dkt. No. 75.). Plaintiff contends that the exhibits should be stricken because the exhibits go beyond the pleadings and Plaintiff objects to Defendants' request that the Court take judicial notice of the exhibits' contents.

The Court has considered only two of the disputed exhibits in ruling on the instant motions to dismiss. Specifically, the Court has considered Exhibit I, which is a copy of VASCO's press release filed with the SEC on February 22, 2016 disclosing results for the fourth quarter and full year of 2015, and Exhibit J, which consists of a table of VASCO stock prices on the NASDAQ Stock Market from April 2, 2015 to August 3, 2015. These two exhibits consist of matters of public record. The Court may properly take judicial notice of such materials in the public record and consider them when ruling on the instant motions to dismiss. *See Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017) (stating that a court in ruling on a motion to dismiss may "take judicial notice of matters of public record") (internal quotations omitted) (quoting *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991)). Therefore, Plaintiff's motion to strike Exhibits I and J is denied. With respect to the remaining exhibits, the

Court did not consider those materials and so the motion to strike them is denied as moot. Plaintiff also requests, in the alternative, that the Court convert the motions to dismiss into motions for summary judgment. The Court may take judicial notice of Exhibits I and J without converting the motions to dismiss, and so the Court declines to convert the motions.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss the amended complaint (Dkt. Nos. 61, 70) are granted, and the amended complaint is dismissed without prejudice. Plaintiff is given until October 22, 2018 to file a second amended complaint that remedies the deficiencies discussed in this Memorandum Opinion and Order. Plaintiff's motion to strike or, in the alternative, to convert the motions to dismiss into motions for summary judgment (Dkt. No. 75) is denied. Specifically, the Court denies the request to strike Exhibits I and J, and denies as moot the request to strike the remaining exhibits and for the alternative relief of converting the motions.

ENTERED:

Dated: September 30, 2018

_____
Andrea R. Wood
United States District Judge